SPRUNG v. MORTON, Immigrant Inspector.

BLOOM v. SAME (two cases).

(District Court, E. D. Virginia. December 31, 1909.)

1. ALIENS (§ 54*)—DEPORTATION PROCEEDINGS—AUTHORITY OF OFFICERS—JURISDICTION OF COURT.

While Congress has conferred on executive officials of the United States the exclusive right to determine questions pertaining to the admission and deportation of aliens by Act Cong. Feb. 20, 1907, c. 1134, 34 Stat. 898 (U. S. Comp. St. Supp. 1909, p. 447), the courts are not thereby deprived of jurisdiction to inquire into the cause of detention of persons held in deportation proceedings who claim not to be amenable to the immigration laws, to determine whether they are lawfully within the country and whether they belong to the inhibited classes.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. § 112; Dec. Dig. § 54.*]

2. HABEAS CORPUS (§ 27*)—WANT OF JURISDICTION—DEPORTATION.

Whether a person held by immigration officers for deportation is within a class amenable to a particular jurisdiction may be reviewed by the courts on habeas corpus.

[Ed. Note.—For other cases, see Habeas Corpus, Cent. Dig. § 22; Dec. Dig. § 27.*]

3. CITIZENS (§ 7*)—WIFE OF AMERICAN CITIZEN.

Under Rev. St. § 1994 (U. S. Comp. St. 1901, p. 1268), providing that any woman who is now or may hereafter be married to a citizen of the United States, and who might herself be lawfully naturalized, shall be deemed a citizen of the United States, an alien female who had lawfully entered the country for a lawful purpose and was married to an American citizen became herself an American citizen and was not subject to deportation.

[Ed. Note.—For other cases, see Citizens, Cent. Dig. § 6; Dec. Dig. § 7.* Citizenship of married women, see note to Hopkins v. Fachant, 65 C. C. A. 5.]

4. ALIENS (§ 54*)—DEPORTATION PROCEEDINGS—LIMITATIONS.

An alien female having entered the United States is not subject to deportation after the lapse of three years from the original entry, by the express limitation of the exclusion act (Act Cong. Feb. 20, 1907, c. 1134, 34 Stat. 898 [U. S. Comp. St. Supp. 1909, p. 447].

[Ed. Note.—For other cases, see Aliens, Cent. Dig. § 112; Dec. Dig § 54.*]

5. ALIENS (§ 46*)—DEPORTATION—RE-ENTRY.

Where an alien has once lawfully entered the United States and is an inhabitant of the country, a re-entry after a temporary absence does not make her subject to deportation.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. § 105; Dec. Dig. § 46.*]

6. MARRIAGE (§ 20*)—COMMON-LAW MARRIAGE—VERBA DE PRÆSENTI.

Where petitioner and her alleged husband, pursuant to an agreement, openly and publicly entered into the marital relation, and had for nine years, except for a short interval, lived and cohabited together as husband and wife, and during that time had so held themselves out to the public and had been received by their acquaintances and friends as such, two children having been born to them in the meantime, such facts were sufficient to establish a valid contract of marriage per verba de præsenti, regardless of the validity of ceremonial marriages attempted by them.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. §§ 12–14; Dec. Dig. § 20.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

7. ALIENS (§ 46*)—LAWFUL ENTRY—EFFECT—CONSTITUTIONAL PRIVILEGES.

Where an alien female has once been lawfully admitted into the United States, she is no longer an alien seeking admission, but is a resident within the country, and as such is entitled to the rights, privileges, and benefits properly appertaining and accruing to her under the guaranties of the Constitution and laws of the land.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. § 105; Dec. Dig. § 46.*]

8. ALIENS (§ 51*)—EXCLUDED CLASSES—MARRIED WOMAN.

Where complainant and her husband and children came to the United States, were lawfully admitted, and had resided within the country for nearly three years, complainant was not subject to deportation as within the excluded classes because for a short time, during a temporary separation from her husband, she practiced prostitution.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. § 111; Dec. Dig. § 51.*]

9. ALIENS (§ 46*)—EXCLUDED CLASSES.

Where petitioner, with his wife and infant children, were lawfully permitted to enter the United States, and had resided there for nearly three years, during which he had conducted himself properly, supported his family in suitable style, was engaged in business, and had declared his intention to become a citizen of the United States, he was not subject to deportation because, during a temporary estrangement between himself and his wife, she had been guilty of immorality, on the theory that he was maintaining an alien in the United States for purposes of prostitution.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. § 105; Dec. Dig. § 46.*]

Separate applications by Sadie M. Sprung, Rebecca Bloom, and Abraham Bloom for himself and infant children, for writs of habeas corpus to procure their release from detention by W. R. Morton, Immigrant Inspector, in deportation proceedings. Writ granted in each case.

D. Lawrence Groner, for petitioners.

L. L. Lewis, U. S. Atty.

WADDILL, District Judge. These three cases will be considered together for the purpose of this opinion; the first case having been heard prior to and on the 14th and 15th days of June, 1909, the second on the 15th day of June, 1909, when both cases were decided and finally disposed of on said last-named date, and the third case was heard, decided, and finally disposed of on the 16th day of June, 1909. Briefly they are as follows:

A. In the Sprung Case, the petitioner alleges that she is unlawfully restrained of her liberty by the respondent, an immigrant inspector of the United States, in default of $5,000 bail imposed by him, for an alleged violation of the immigration laws; the government's contention being that she should be deported because she is an alien who came into the United States some 15 years ago for the purpose of prostitution, and led the life of a prostitute; that she has since twice returned to Europe, the last trip being in May, 1909, and having since her return resumed her unlawful practices. The petitioner, on the other hand, says that she was lawfully admitted into this country,

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

and has long resided herein; that she is the lawful wife of an American citizen, and since her marriage has lived with him, leading in all respects. a proper and moral life; that when she left this country in May, 1908, as set forth in the return to the writ of habeas corpus, she did so as the wife of an American citizen, she and her husband having duly secured passports for that purpose; that she returned to her native land for the purpose of medical treatment, and to see her parents; that she and her husband regularly returned to this country as such husband and wife, and since their return have resided here; that she has in all respects properly conducted herself since her return, and is in no way subject to deportation from this country, or to the provisions of the immigration acts.

B. In the Rebecca Bloom Case, the petitioner alleges that she is illegally restrained of her liberty by an immigrant inspector of the United States, in default of $5,000 bail imposed by him, for an alleged violation of the immigration laws; the government's contention being that she should be deported because she is an alien who entered this country on or about September 22, 1906, in violation of law, for the purpose of prostitution, and other immoral purposes, and which since her arrival she has continued to practice. The petitioner's case is that she, along with her husband and two children, aged, respectively, six and eight years, were lawfully admitted to this country at and about the time mentioned by the respondent; that she was and is the lawful wife of Abraham Bloom, and has been since the year 1900, during which time said two children were born unto them; that she and her husband first lived in London, England, then Capetown and Johannesburg, South Africa, and upon coming to this country, for a short while resided in New York, then in St. Louis, and then Norfolk; that she has continuously lived with her husband, except for a short period between the time of her leaving St. Louis and his coming to Norfolk; that at the time of filing the petition, and for some time prior thereto, she and her husband and children had been lawfully and properly living together in the city of Norfolk; and that neither she nor her husband or children are in any respect liable to deportation, or in any manner subject to the provisions of the immigration laws of the United States, they having been properly admitted to this country nearly three years ago, not in contravention of said laws, are now bona fide inhabitants of the city of Norfolk, Va., and are no more deportable than any other person lawfully resident in the country.

C. In the Abraham Bloom Case, the petitioner alleges that he is illegally restrained of his liberty by an immigrant inspector of the United States, in default of $5,000 bail imposed by him, for an alleged violation of the immigration laws; the government's contention being that he is liable to deportation, and has been ordered deported by such inspector, because it is alleged that he imported into the United States a prostitute (referring to his wife, Rebecca Bloom), and that their two children were likely to become a public charge. Petitioner's case is that he has committed no act in violation of the immigration law; that Rebecca Bloom has been his lawful wife since the year 1900; that they were properly and regularly admitted with their children into this country, and are now lawfully and happily liv-

ing together in the city of Norfolk; that neither he nor his children are liable to deportation, or in any manner subject to the provisions of the immigration laws; that he is at this time, as he has been since his marriage to his wife, supporting his family properly and decently; that they are not living, and have not lived, in violation of any law, nor are his children in any way likely to become a charge upon the public.

These are the contentions substantially set forth in the pleadings, and as shown by the evidence. The cases were heard upon the petitions, returns, and traverses to the returns, the motions to quash the returns, and the motions to dismiss on the part of the government, and the testimony adduced, which consisted of documentary evidence and oral examinations of witnesses by the petitioners and respondent in each case, and upon an agreement that the testimony had, and the oral examinations of witnesses taken in the Rebecca Bloom Case, should be treated and considered as having also been taken in the case of Abraham Bloom and his children.

The jurisdiction of the court is raised by the respondent, the immigrant inspector, in all three cases; his position being briefly, that the petitioners severally are in custody for alleged violations of the immigration laws, and are alone subject to the orders of the Department of Commerce and Labor, of which he is an official, that the legality of their detention cannot be inquired into or determined by the courts of the country, and that his action, and that of the executive department of which he is a member, is final and conclusive in the premises. This question will be considered in connection with the merits of the several cases, respectively; and at the threshold it may be said that the court is inclined to think that the trend of authority is that the Congress can confer upon executive officials of the government the exclusive right of determining questions pertaining to the admission of aliens into this country, and the deportation of those improperly admitted in violation of the provisions of the act, and that this power as to such immigrants is vested in the Secretary of Commerce and Labor upon his conforming to the provisions of the act of February 20, 1907, entitled "An act to regulate the immigration of aliens into the United States." Act Feb. 20, 1907, c. 1134, 34 Stat. 898 (U. S. Comp. St. Supp. 1909, p. 447). While this is true, however, it cannot be possible that the courts are deprived of jurisdiction and authority to inquire into the cause of detention of persons in the position of petitioners here, who claim not to be in any way amenable to the provisions of the immigration laws, one who had been in the country 15 years, and is the wife of an American citizen, and the other, the husband, wife, and children who were lawfully admitted into the country nearly three years ago, the husband and wife having lived together long before coming to this country, and have since, except for a short interval, so lived as they were living at the time of their arrest.

The courts must have the right to determine when persons have once been admitted into the country, apparently lawfully and properly, whether they belong to the inhibited class or not. The Secretary of Commerce and Labor may have the right to say who shall be ad-

mitted, and as to them doubtless his determination is final; but, when persons have once become residents and citizens of this country, surely as to them he cannot have such authority and power, and the courts be deprived of all jurisdiction in matters affecting their liberty and right to remain in the country; and this would seem to be particularly true where the alleged cause for deportation arose from misbehavior long after admission into the country. If that is not so, then every resident of this country, whether a naturalized citizen or not, who happens to have at one time been admitted to this country from abroad, certainly during the period of three years after admission to the country, will be liable to arrest and summary deportation; and it goes a little further. If persons who lawfully enter into the country can be deported for misconduct at any time within three years after arrival, it places the United States in the position of undertaking a system of surveillance of all persons who live in the country during the three years after their arrival, with the right to deport them for misconduct committed after they come here, although they may have been admitted in all respects legally and properly, and in every way conducted themselves properly for virtually the entire time of the three years' residence. And the contention would go even further, if the ruling of the Secretary of Commerce and Labor is final and conclusive upon the question of who and who are not American citizens. It would enable him to exclude all persons, including native-born Americans, from the United States, without day or opportunity to be heard, as his adjudication on the question of citizenship would be final. The fact that the court can inquire by habeas corpus into the question of whether a person is within the class amenable to a particular jurisdiction has frequently been the subject of review by the courts, and would seem to be no longer open to controversy.

The cases of Ex parte Milligan, 4 Wall. 2, 18 L. Ed. 281, and McNichols v. Pease, 207 U. S. 100, 107, 110, 28 Sup. Ct. 58, 52 L. Ed. 121, are illustrations of this general subject. In the first-named case, though the petitioner had been tried by a military court, and condemned to and was shortly to be put to death, the Supreme Court of the United States took jurisdiction to determine for itself the question of whether or not the petitioner was a person subject to be tried by a military court, and decided that he was not, and discharged him. In the last-named case, which involved the question of whether or not a man ordered to be extradited by the Governor of Illinois, upon a requisition from the Governor of Wisconsin, could be removed to the latter state, the petitioner insisting that he was not, in point of fact, a fugitive from the state of Wisconsin. The case was tried in the lower court of the state of Illinois, went to its Supreme Court, and was finally appealed to the Supreme Court of the United States, involving the simple question of whether the defendant was in point of fact extraditable. In Ex parte Yerger, 8 Wall. 95, 19 L. Ed. 332, it is said by the Supreme Court in considering the constitutional provision guaranteeing the right of habeas corpus, and its history, that:

"The terms of this provision necessarily imply judicial action. In England, all the higher courts were open to applicants for the writ, and it is hardly supposable that under the new government, founded on more liberal ideas and principles, any court would be, intentionally, closed to them."

The following cases would seem to support the views herein contended for: In re Lem Moon Sing, 158 U. S. 542, 15 Sup. Ct. 967, 39 L. Ed. 1082; Hopkins v. Fachant, 130 Fed. 839, 65 C. C. A. 1, a decision of the Circuit Court of Appeals for the Ninth Circuit; Rodgers v. United States, 152 Fed. 346, 81 C. C. A. 454, a decision of the Circuit Court of Appeals of the Third Circuit; United States v. Nakashima, 160 Fed. 842, 87 C. C. A. 646, a decision of the Circuit Court of Appeals for the Ninth Circuit.

The cases will now be taken up and considered on the merits, in the order named.

First. In the Sprung Case, the facts and testimony as viewed by the court in this case sustain the contentions made by the petitioner, namely: That she is the wife of an American citizen, and hence herself a citizen, and not a deportable subject. She came to this country as a single woman, some 15 years ago, being of Austrian birth. She did not belong to any inhibited class, and her entrance was lawful. That for a long time thereafter she was in business in the city of New York as a milliner, during which time she met her husband, who was a countryman of hers. That she left there and came to Baltimore, and married her husband; the marriage license having been secured from the court in Baltimore, which they both understood legalized the wedding. Shortly thereafter they went to Europe, visited the home of the petitioner's parents in Austria, stayed four months, and returned to this country. That they had a disagreement after returning, and she separated from her husband, and for quite a while did lead an immoral life, as she had previously done after leaving New York, but without the knowledge of her husband. That something over a year ago she and her husband made up their quarrel and renewed their relations as husband and wife, which continued up to the time of her arrest. That in August, 1908, she and her husband again visited her parents; she having returned to her native country for that purpose, and to consult a specialist at Vienna. That they remained abroad some nine months. That she had a delicate operation performed, and she returned to this country in May, 1909, with her husband, bringing a letter from the specialist in Vienna to her physician at Norfolk. That upon this trip abroad she and her husband regularly secured passports from this country, and left and returned to the country as man and wife. That while abroad on this last trip for the first time they were advised of some lack of formality in their marriage, and in May of the present year, immediately after their return to this country, a Jewish rabbi in New York, as shown by his certificate admitted in evidence, married them in pursuance of the license issued in Baltimore. That at the time of her arrest she was temporarily a resident of Norfolk, with a view of consulting her physician, lawfully living with her husband, who was supporting, caring for, and defending her, and he was present in court in person and by counsel, demanding her release. And that she had properly conducted herself since last joining her husband, and had not been guilty of any immoral practices.

Upon this state of facts, the court will first consider the effect of the marriage by the petitioner to her husband, an American citizen,

conceding that she left the country and re-entered the same within three years. In the view taken by the court, the petitioner, having originally entered the country lawfully, and for a lawful purpose, is not liable to deportation in any event; but, assuming that she may be, the lapse of three years from the original entry would preclude deportation under the express limitation prescribed by the act, unless she be subject thereto by reason of her departure from and re-entry into the country within the statutory period of three years prior to her arrest. The authorities are clear that, being the wife of an American citizen, her citizenship is that of her husband, and she cannot be deported, as they are also that the re-entry of an alien, once lawfully an inhabitant of the country, into the country, after only a temporary absence, does not make her subject to deportation.

The statute of the United States (Act Feb. 10, 1855, c. 71, § 2, 10 Stat. 604; section 1994, Rev. St. [U. S. Comp. St. 1901, p. 1268]), as interpreted by the highest courts of the land, would seem to be conclusive on the status of the citizenship of the petitioner. The statute (section 1994) reads:

"Any woman who is now or may hereafter be married to a citizen of the United States, and who might herself be lawfully naturalized, shall be deemed a citizen."

In Kelly v. Owen, 7 Wall. 496, 19 L. Ed. 283, it was held that when a woman is in a state of marriage to a citizen, whether his citizenship exist before or after his marriage, she becomes by that fact a citizen also. That the object of the act above cited was to allow the citizenship of the wife to follow that of her husband, without the necessity of any application for naturalization on her part, and that the language in the act "who might herself be lawfully naturalized" referred to the race or class of persons that might be naturalized, and not to the other qualifications required for such purpose.

In Leonard v. Grant (C. C.) 5 Fed. 11, a decision by Judge Deady of the Southern District of New York will be found an interesting discussion of this subject. In that case it is held that an alien woman, entitled to be naturalized, who is married to a citizen of the United States, becomes by that act a citizen, and that such admission to citizenship has the same force and effect as if such woman had been naturalized by the judgment of a competent court; and, further, that the language of the act "might herself be lawfully naturalized" does not require that the woman shall have the qualifications of residence, good character, etc., as in case of admission to citizenship in a judicial proceeding, but it is sufficient if she is of the class or race of persons who may be naturalized under existing laws.

In United States v. Kellar (C. C.) 13 Fed. 82, a decision of Justice Harlan, on circuit, it is decided that upon the marriage of a resident alien woman with a naturalized citizen she, as well as her infant son, dwelling in this country, become citizens of the United States, as fully as if they had become such in the special mode prescribed by the naturalization laws.

In Hopkins v. Fachant, 130 Fed. 839, 65 C. C. A. 1, supra, a comparatively recent decision of the Circuit Court of Appeals for the

Ninth Circuit, will be found a review of the authorities on this general subject; and in that case it is held that a woman in the position of the petitioner here is entitled to be discharged upon habeas corpus. Reference may also be had to a very recent opinion of Attorney General Wickersham, dated July 30, 1909, in which he ably and fully discusses the very question here under consideration, and reaches the conclusion that the marriage of an alien woman to a native-born citizen prevents her deportation.

It is equally well settled that aliens who have once lawfully acquired a residence in this country do not lose the same, or become liable to deportation under the immigration laws, by temporarily leaving the country, and re-entering. The authorities to maintain the general propositions are numerous, and might be cited almost without number. In re Lau Ow Bew v. United States, 144 U. S. 47, 12 Sup. Ct. 517, 36 L. Ed. 340; In re Buchsbaum (D. C.) 141 Fed. 221, 222, 223; United States v. Aultman (D. C.) 143 Fed. 922.

Second. In the Rebecca Bloom Case, the facts and testimony as viewed by the court sustain the contention made by the petitioner, namely: That she became the wife of Abraham Bloom in the year 1900, in the city of London, England, under a marriage ceremony performed according to the Jewish faith, and by a person authorized to celebrate the same. That she lived with her husband in London for some time as his wife, and was held out to the world as such. That she and her husband then went to Capetown, and later to Johannesburg, remaining in South Africa for some two or three years, during which time two children were born to them, as was shown by certified copies of registers of birth of said children, giving the names of the children, and the names of Abraham Bloom and Rebecca Bloom as their father and mother. That during all of this time petitioner was held out and recognized as the wife of said Abraham Bloom. That from South Africa petitioner, together with her husband and children, returned to London, and lived together as husband and wife for eight months, then came to New York, and, with their children, were duly admitted as husband and wife into the United States by the immigration authorities. After a stay of several months in New York, they went to St. Louis, where her husband engaged in the restaurant business and as a horse trader. That they lived together in St. Louis as man and wife, and petitioner was held out to be and accepted as the wife of said Abraham Bloom. That after remaining there for about a year petitioner left her husband and came to Norfolk, Va. That in January, 1909, her husband, who had previously visited Norfolk with a view of having her return to St. Louis with him, moved to Norfolk, and at his instance she rejoined him and their children. Later, while visiting New York, they caused a regular marriage ceremony to be performed, according to the laws of that state, as appeared by certified copy of the certificate dated March 31, 1909, admitted in evidence. That since returning to her husband the petitioner has lived with him and her children, and they are now residing in Norfolk, where the said Abraham Bloom is engaged in the business of a horse dealer, living in a respectable neighborhood, and he is sup-

porting his family in a proper manner. That since petitioner's return to her husband, and up to the time of her arrest, she has in all respects conducted herself in a moral and decent manner, as indeed she had done during all her married life of nearly 10 years, except for a short period during her disagreement with and separation from her husband, when the court believes from the testimony that she engaged in immoral practices.

Upon this state of facts, the legal question presented for the consideration of the court is whether or not Rebecca and Abraham Bloom are man and wife within the meaning and intent of the law, and whether she and her husband, having been lawfully admitted into this country as such man and wife, with their children, and resided therein for nearly three years, she can be deported for alleged misconduct on her part occurring long after her admission into the country.

That the petitioner Rebecca Bloom and her husband, Abraham Bloom, pursuant to agreement to that end, openly and publicly entered into the marital relation some nine years ago, and have since, except for a short interval, lived and cohabited together as man and wife, is undisputed. And during the time they have so held themselves out to the public, and have been accepted and received by their acquaintances and friends as such, is likewise uncontradicted; two children in the meantime having been born unto them. This would seem to be sufficient to constitute a valid common-law marriage, even assuming that neither of the two formal ceremonies of marriage were valid, which by no means can be admitted, clearly as to the latter ceremony; and what is said in this respect applies equally to any alleged insufficiency in the marriage ceremony of the first-named petitioner, Sadie M. Sprung.

In Meister v. Moore, 96 U. S. 76, 24 L. Ed. 826, the Supreme Court, in passing upon the correctness of an instruction to a jury to the effect that a marriage entered into in the absence of a minister, or magistrate, was invalid, said:

"It certainly withdrew from the consideration of the jury all evidence, if any there was, of informal marriage by contract per verba de præsenti. That such a contract constitutes a marriage at common law there can be no doubt, in view of the adjudications made in this country, from its earliest settlement to the present day. Marriage is everywhere regarded as a civil contract. Statutes in many of the states, it is true, regulate the mode of entering into the contract; but they do not confer the right. Hence they are not within the principle that, where a statute creates a right and provides a remedy for its enforcement, the remedy is exclusive. No doubt, a statute may take away a common-law right; but there is always a presumption that the Legislature has no such intention, unless it be plainly expressed. A statute may declare that no marriages shall be valid unless they are solemnized in a prescribed manner; but such an enactment is a very different thing from a law requiring all marriages to be entered into in the presence of a magistrate or a clergyman, or that it be preceded by a license, or publication of bans, or be attested by witnesses. Such formal provisions may be construed as merely directory, instead of being treated as destructive of a common-law right to form the marriage relation by words of present assent. And such, we think, has been the rule generally adopted in construing statutes regulating marriage. Whatever directions they may give respecting its formation or solemnization, courts have usually held a marriage good at common law to be good notwithstanding the statutes, unless they contain express words of nullity."

And at page 82 of 96 U. S. (24 L. Ed. 826), quoting from an opinion of Judge Cooley (Hutchins v. Kimmell, 31 Mich. 126, 18 Am. Rep. 164), who was considering the question of whether a marriage had been legally effected in a foreign country, said:

"Had the supposed marriage taken place in this state, evidence that a ceremony was performed ostensibly in celebration of it, with the apparent consent and co-operation of the parties, would have been evidence of a marriage, even though it had fallen short of showing that the statutory regulations had been complied with, or had affirmatively shown that they were not. Whatever the form of ceremony, or even if all ceremony were dispensed with, if the parties agreed presently to take each other for husband and wife, and from that time lived together professedly in that relation, proof of these facts would be sufficient to constitute proof of a marriage binding upon the parties, and which would subject them and others to legal penalties for a disregard of its obligations. This has become the settled doctrine of the American courts; the few cases of dissent, or apparent dissent, being borne down by the great weight of authority in favor of the rule as we have stated it."

That petitioner, Rebecca Bloom, does not come within the class of deportable persons under the immigration laws, is too clear to admit of serious doubt or cavil. This would seem to be manifest from the purpose and intent of the act of February 20, 1907, as shown by its title, which is "An act to regulate the immigration of aliens into the United States," not an act to supervise and control the conduct of aliens lawfully admitted into the United States. This petitioner, along with her husband and children, had been lawfully admitted to this country for nearly three years, and the real ground for her arrest and detention arises from alleged misconduct on her part during that period, and long after her admission into the country. Having been once lawfully admitted, she no longer occupies the status of an alien woman seeking admission, but is a resident within the country, and as such entitled to all of the rights, privileges, and benefits properly appertaining and accruing to her under the guaranties of the Constitution and the laws of the land.

Authorities to support the general proposition might be furnished almost without limit, but only a few of them need be cited. In re Panzara (D. C.) 51 Fed. 275; In re Martorelli (C. C.) 63 Fed. 437; Hopkins, Marshal, v. Fachant, 130 Fed. 839, 65 C. C. A. 1; In re Buchsbaum (D. C.) 141 Fed. 221; Rodgers v. United States, 152 Fed. 346, 81 C. C. A. 454; United States v. Nakashima, 160 Fed. 842, 87 C. C. A. 646; Ex parte Watchhorn (C. C.) 160 Fed. 1014. In Re Buchsbaum (D. C.) 141 Fed. 222, Judge McPherson succinctly states the law applicable to those in the position of the petitioner as follows:

"After an alien has once become a resident, he is entitled to the same liberty of movement enjoyed by residents and citizens alike; and, until he abandons his residence, he is no longer amenable to the excluding provisions of the immigration law. That law is intended to operate when the emigrant presents himself for the first time, but after he has passed the scrutiny of the inspectors, and has been admitted, he is then entitled to the rights and privileges of residents in the United States as long as he continues to be a member of this class. It is true that in one sense he is always an alien, until he becomes a citizen, although he may reside in this country for many years before he applies to be naturalized. But this is not the sense in which the word has been used in the statutes regulating immigration. In these statutes

an alien immigrant is one who offers to take up his residence here, but has not yet carried out his desire."

In Lem Moon Sing v. United States, 158 U. S. 538, 547, 15 Sup. Ct. 967, 971 (39 L. Ed. 1082), a case relied on by the respondent to sustain its contention, conceded by the court here, that Congress can commit to executive officers exclusive jurisdiction to pass upon and determine questions affecting the admission of aliens into the country, the Supreme Court said:

"While he lawfully remains here he is entitled to the benefit of the guaranties of life, liberty, and property, secured by the Constitution to all persons, of whatever race, within the jurisdiction of the United States. His personal rights when he is in this country and such of his property as is here during his absence are as fully protected by the supreme law of the land as if he were a native or naturalized citizen of the United States."

As viewed by the court, these cases clearly support the claim of petitioner as to her legal status, and her right to remain in the country, as well as of the power and authority of the court to inquire into the day and cause of her detention.

Third. In the case of Abraham Bloom and his two infant children, Sarah and Isaac, the facts and testimony, as viewed by the court, sustain the contentions made by the petitioner in behalf of himself and his children, respectively. Such facts have, in the main, been set out in what has been heretofore said regarding the status of Rebecca Bloom. In addition thereto, petitioner Abraham Bloom shows that he entered this country legally, with his said wife and children, and that they have remained continuously in this country until the time of his arrest, without the commission of any offense by him against the laws of the United States; that he has been engaged in business since his entry into the country, and has always and at all times been able to and has provided for his wife and family; that, with the exception of the short period when his wife left him, he had always maintained a comfortable home, and supported his family in a style suitable to their station in life; that, after his wife returned to him, he again provided a home for his family, and is now supporting his wife and children, and they are all living happily together; that he did not bring his wife or any other woman to this country for the purpose of leading an immoral life; that he is fully able to and is now supporting his said infant children; that they have never been, are not now, and there is no likelihood of their becoming, public charges; that petitioner has always since entering this country conducted himself in a proper manner, and led a moral life in every respect; that since his admission into this country he has declared his intention to become a citizen of the United States, as appeared from his declaration of intention made a part of the record in this case.

What has been said respecting the law in the Rebecca Bloom case applies with equal force to this petitioner, and there clearly would appear to be no reason why either he, or his two infant children, should be restrained of their liberty or deported from the country. Indeed, his arrest, and the attempted deportation of himself and his children, was not undertaken until the court, after a full hearing and consideration of all the facts, had decided that the petitioner Rebecca Bloom, the

mother of the children and wife of the petitioner, was lawfully in the country, did not come, and had not been brought for any immoral purpose, and was not liable to deportation therefrom. On the next day, the respondent inspector, apparently in open defiance of the court's decision, caused the arrest in the case to be made, and went through the form of a hearing, as shown by the proceedings made a part of his return to the writ, and in which it will appear that every effort was made to cause petitioner to incriminate or inculpate himself, even going so far as to use his testimony against him, given the day before in his wife's case, in plain violation of the Constitution and laws of the land on the subject.

With the propriety of and the cause for the arrests in these three cases, the court is not concerned, and desires to make no comment other than what is said regarding petitioner Abraham Bloom; but, in the light of the facts as developed at the hearing, it feels that it is its plain duty to say that there not only exists no reason why the petitioners or either of them should be either restrained of their liberty, or deported from the country, but that, on the contrary, as desirable as it is to strictly enforce the immigration laws against the class of undesirable persons seeking admission into this country, there exists as to them every reason why they should be forthwith set at liberty. Petitioner Sadie M. Sprung is apparently a physical wreck, in a highly nervous and hysterical condition, and would necessarily be seriously affected either by confinement pending deportation, or the excitement incident thereto; and she requires the constant care and attention of her husband, which she certainly receives, as far as can be judged from his seeming devotion to and earnest defense of her in these proceedings.

Petitioner Rebecca Bloom is a strong healthy woman, the mother of two small children, who require and receive her constant and unremitting care and attention. She is living with her husband, lawfully and quietly, taking care of and raising her offspring, and to break up this family, and leave the children motherless, either by the continued confinement or deportation of their mother, would seem to be cruel in the extreme. And, so far as petitioner Abraham Bloom is concerned, he appears neither to have been guilty of any improper conduct before or upon coming into this country, nor since his admission herein; he has every appearance of being a worthy and industrious man, who will faithfully perform his undertakings; he is the head of this household, consisting of himself, wife, and two children, all of whom are entirely respectable and decent in appearance, neatly clad, and well provided and cared for; and he, in these proceedings, has battled for the possession of his loved ones in a manner that affords ample evidence of courage, conviction, and character. His confinement would probably cause his children to become a public charge; but in no other way would such a thing ever likely occur.

No good reason exists, or can be suggested, why this family should be broken up. The father has confessedly violated no law. The little children are surely innocent; and, even as to the mother, her alleged misconduct, if such at all can be made the subject of lawful complaint for deportation, has long since been overlooked and for-

given by a considerate and confiding husband, the family has been re-united, and are now happily together, and the same should be neither invaded nor broken up by the ruthless hand of the law. Certainly there should exist some great exigency or reason for so doing, which is utterly lacking in this case.

The conclusion of the court as to these petitioners is that they are in no respect amenable to the jurisdiction of the Secretary of Commerce and Labor, and that they are clearly entitled to be discharged under the writs of habeas corpus in these cases, and it will be so ordered.